**UNITED STATES DISTRICT COURT**
                   **FOR THE DISTRICT OF NEW HAMPSHIRE**


**Ann Diomede-Reynolds**

   **v.**                              Case No. 07-cv-222-PB
                                       Opinion No. 2008 DNH 068
**Michael J. Astrue, Commissioner,**
**Social Security Administration**


                         **MEMORANDUM AND ORDER**

    Ann Diomede-Reynolds moves to reverse the Commissioner of Social Security's determination that she is not eligible for disability insurance benefits ("DIB").  For the reasons set forth below, I grant in part Diomede-Reynolds' motion to reverse, deny the Commissioner's motion to affirm, and remand this case to the Social Security Administration.

                         **I.   BACKGROUND**[1]

**A.   Procedural History**

    Diomede-Reynolds filed an application for DIB in March 2001, alleging disability since February 2000.  Tr. at 69-71.  This

---

[1] The background information is drawn from the Joint Statement of Material Facts (Doc. No. 8) submitted by the parties.  Citations to the Administrative Record Transcript are indicated by "Tr."

application was initially denied, and Diomede-Reynolds requested a hearing before an administrative law judge ("ALJ"). Tr. at 33-37. The hearing took place on August 29, 2002, and the ALJ denied her application on October 21, 2002. Tr. at 266-77, 440-72. After Diomede-Reynolds requested review, the Appeals Council vacated the ALJ's decision and remanded the matter for a new hearing. Tr. at 284-86.

On remand, the ALJ held two supplemental hearings. At the first hearing, which took place on April 27, 2005, the ALJ heard testimony from Diomede-Reynolds, her husband, and a medical expert. Tr. at 473-513. At the second hearing, which took place on July 27, 2005, the ALJ heard testimony from Diomede-Reynolds' husband, two medical experts, and a vocational expert ("VE"). Tr. at 514-69.

On August 22, 2005, the ALJ applied the five-step process[2] specified in 20 C.F.R. § 404.1520 and denied Diomede-Reynolds'

---

[2] When determining whether a claimant is disabled, the ALJ is required to make the following five inquiries: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work. 20 C.F.R. § 404.1520.

application.  Tr. at 21-31.  Specifically, the ALJ found that although Diomede-Reynolds' impairments (panic disorder, anxiety disorder, elevated dopamine levels, and hypertension) were collectively severe, they did not meet or equal a listed impairment (step three), and they did not prevent her from performing her past relevant work as a teacher and a human resource manager (step four).  Tr. at 30.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Diomede-Reynolds' request for review.  Tr. at 9-11.  Diomede-Reynolds then timely filed the present action.

B.   **Education and Work History**

Diomede-Reynolds was 58 years old in February 2000, when she allegedly became disabled, and 64 years old when the ALJ denied her application in August 2005.  Tr. at 69.  She is a college graduate and received a masters degree in 1984.  Tr. at 84.  Her past relevant work ("PRW") was as a human resources manager and a teacher.  Tr. at 80, 101-04.  She last worked in February 2000, and her date last insured for DIB purposes was December 30, 2005. Tr. at 72.

### C. **Medical Evidence**

Although Diomede-Reynolds reported no health complaints at a routine check-up in 1999, she underwent treatment for sinusitis (sinus inflammation) and hypertension (high arterial blood pressure) in January 2000.  Tr. at 204, 208-09, 211.  In February 2000, she was hospitalized due to an episode of uncontrolled high blood pressure.  Tr. at 182.  Urine testing revealed that her dopamine levels were elevated.  Tr. at 193.  After four days, she was discharged in improved condition.  Tr. at 194-95.  After her release, Dr. Lauren Maza noted that although Diomede-Reynolds' blood pressure was usually "very well-controlled," it sharply increased when Diomede-Reynolds failed to take her usual dose of clonidine (an anti-hypertensive medication) -- apparently referring to the crisis which resulted in Diomede-Reynolds' hospitalization.  Tr. at 219.

During follow-up visits in March and April 2000, Dr. Mariano Battaglia indicated that Diomede-Reynolds continued to suffer from elevated blood pressure.  Tr. at 223, 226.  He recommended that she remain out of work until July 2000.  Tr. at 227.

In July 2000, Diomede-Reynolds told Dr. Battaglia that she had taken a leave of absence from work and would be retiring

after the leave ended.  Tr. at 229.  She reported that she felt "fine" and was tolerating her medications well, and her home testing showed that her blood pressure was mostly controlled. Tr. at 229.  In September 2000, shortly before she moved to New Hampshire, Diomede-Reynolds reported that her blood pressure had been "a little bit up, but not tremendously out of range," and that she was otherwise "not having any major problems."  Tr. at 232.

In December 2000, Diomede-Reynolds was seen at Pittsfield Medical Center in New Hampshire.  She reported that over the preceding year, she had experienced difficulty managing her hypertension, but that "semi-retirement" and anxiety medications had brought her blood pressure under control.  Tr. at 235.  At a follow-up visit in January 2001, she reported that her hypertension was "very well controlled" other than one rare elevation.  Tr. at 236.  In March, she reported that her anxiety levels were improved and that, as a result, her hypertension had "settled down."  Tr. at 237.  In June, she reported that her hypertension and anxiety were both well-controlled, but that she felt unable to return to a classroom to teach.  Tr. at 238.

In September 2001, Dr. Warren Fitzergald conducted a psychological examination of Diomede-Reynolds. Tr. at 249-53. He noted no signs of mood difficulties or current anxiety. Tr. at 251. On the Beck Anxiety Inventory, her responses indicated a severe problem with anxiety, while her answers to the Beck Depression Inventory fell within the minimal range. Tr. at 252. In terms of function, Dr. Fitzgerald concluded that Diomede-Reynolds showed good understanding and memory and was capable of interacting well with others, that her concentration and task completion were likely to be good unless she was tired or distressed, and that her ability to adapt to work situations and interact with supervisors was adequate. Tr. at 252. Her primary problem came from her feelings of anxiety regarding work, which might cause her blood pressure to rise in work situations. Tr. at 252.

Dr. Paul Clark was Diomede-Reynolds' internist in New Hampshire. The first diagnosis from Dr. Clark in the record is dated June 17, 2002, and indicated that Diomede-Reynolds' hypertension was not adequately controlled and that her desire for disability benefits was reasonable "for a number of reasons." Tr. at 259-60. On the same day, Dr. Clark drafted a letter

-6-

opining that "returning to a stressful environment with acceleration of her hypertension would put her at increased risk for stroke and I would consider it inadvisable to do this." Tr. at 261. He did not think she had any limitations on her ability to meet the physical demands of work, other than the need to avoid lifting more than ten pounds (a limitation he attributed to her age rather than her hypertension). Tr. at 262-65. Her primary limitation, he opined, arose from "stress related problems exacerbating her hypertension." Tr. at 265.

In July 2002, Dr. Clark noted that Diomede-Reynolds' anxiety and hypertension were both "improved," and her home blood pressure readings -- while higher than ideal -- were closer to the goal. Tr. at 376. In September 2002, Dr. Clark treated Diomede-Reynolds for an ear-related ailment and then an upper-respiratory infection; during both visits, she mentioned no complaints regarding hypertension or anxiety. Tr. at 377, 379. In October 2002, Dr. Clark treated her for pain in her right knee; although it did not limit her activities, she expressed concern that it might be arthritis. Tr. at 382. Dr. Clark diagnosed the pain as instead being caused by bursitis. Tr. at 383. He also noted that her anxiety disorder was well-

controlled.  Tr. at 383.

In January 2003, Diomede-Reynolds reported some difficulty in managing her blood pressure after switching from oral clonidine to clonidine patches.  Tr. at 385.  In February 2003, her blood pressure seemed to be "under excellent control" and she told Dr. Clark that she was "doing quite well."  Tr. at 387.  Diomede-Reynolds again reported that she felt "quite well" overall in June 2003.  Tr. at 396.  Dr. Clark noted that her average blood pressure was under reasonable control despite labile (borderline) hypertension.  Tr. at 397.  In December 2003, she was again "doing very well in general" with labile hypertension but no chest pain or shortness of breath.  Tr. at 400.

At her next visit with Dr. Clark, in July 2004, Diomede-Reynolds reported no new symptoms; although her blood pressure was higher than ideal, she stated that she was monitoring it closely and generally doing better.  Tr. at 407.

In November 2004, Dr. Richard Boss, a cardiologist, examined Diomede-Reynolds at the referral of Dr. Clark.  Tr. at 409.  She indicated that there had not been any dramatic change in her functional condition over time, and stated that although she once

experienced a mild chest ache after engaging in moderate activity, she did not have any patterns of exertional chest discomfort, lightheadedness, syncope, ankle swelling, or nocturnal shortness of breath.  Tr. at 409.  Dr. Boss concluded that although her current medical regime was unable to bring her hypertension under more than marginal control, it remained appropriate.  Tr. at 410.

In August 2001, Dr. Nault, a state agency physician, reviewed Diomede-Reynolds' medical records and concluded that she would be able to perform light level work.  Tr. at 240-44.  Although her limitations were more extensive during her episode of uncontrolled hypertension in February 2000, the aggravated severity had not persisted for more than twelve months and no physician currently described disabling limitations.  Tr. at 244.  The following month, Dr. Nault conducted another review and concluded there was no basis for altering his initial assessment.  Tr. at 248.

In September 2001, Dr. Michael Schneider, a state agency reviewing psychologist, concluded that Diomede-Reynolds had no vocationally significant limitations of mental functioning.  Tr. at 254-57.

Dr. Gerald Koocher appeared as a psychological expert at the April 2005 hearing before the ALJ. Tr. at 499-511. He testified that although Diomede-Reynolds' self-reported condition tended to suggest that she suffered from work-related anxiety, the record did not establish any marked impairment in any areas of mental functioning. Tr. at 507-09.

Dr. Morton Solomon appeared as a medical expert at the July 2005 hearing. Tr. at 529-46. He testified that the elevated urine dopamine level measured during Diomede-Reynolds' January 2000 hospitalization indicated the presence of an adrenal tumor. Tr. at 530-33. This tumor, he opined, created episodes of high dopamine levels, which in turn caused Diomede-Reynolds to suffer from hypertension. Tr. at 534-44. He was confident that a tumor existed because he knew of nothing else that would have caused the elevated dopamine reading. Tr. at 540-41. Based on this diagnosis, Dr. Solomon opined that although Diomede-Reynolds' condition "doesn't meet any of the specific listings," it was equal in severity to listings 9.06 (hyperactive adrenal cortex), 6.02C5 (persistent fluid overflow syndrome), and 2.02 (visual acuity). Tr. at 26, 533-40.

Dr. James Claiborn also appeared as a medical expert at the July 2005 hearing.  Tr. at 555-59.  He testified that nothing in the medical record suggested that Diomede-Reynolds met the criteria for an anxiety-related mental impairment.  Tr. at 556-58.

**D.   Vocational Evidence**

Mr. Howard Steinberg appeared as a VE at the August 2002 hearing.  He testified that Diomede-Reynolds' work as a teacher was a skilled job both typically and actually performed at the light level.  Tr. at 465.  Her job as a human resources manager was a skilled job that was typically performed at the sedentary level, but was light as she had actually performed it.  Tr. at 465.  When asked by the ALJ to assume that Diomede-Reynolds could perform sedentary work that involved no climbing, balancing, kneeling, crouching, crawling, or stooping, Mr. Steinberg opined that she could transfer her skills to the sedentary job of personnel clerk.  Tr. at 466-48.  This occupation would not involve the same work stress issues faced by a human resources manager.  Tr. at 469.  In identifying this occupation, Mr. Steinberg noted that it would involve only a limited degree of vocational adjustment from her prior work as a human resources

-11-

manager, and took into account the fact that Diomede-Reynolds was nearing retirement age.  Tr. at 471-72.

## II.  **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), I am authorized to review the pleadings submitted by the parties and the transcript of the administrative record and enter a judgment affirming, modifying, or reversing the decision of the ALJ.  My review is limited to determining whether the ALJ used the proper legal standards and found facts based upon the proper quantum of evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000); Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

The ALJ's findings of fact are accorded deference as long as they are supported by substantial evidence.  Ward, 211 F.3d at 655.  Substantial evidence to support the ALJ's factual findings exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, the ALJ's factual findings

are conclusive even if the record "arguably could support a different conclusion." Id. at 770. The ALJ's findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35.

The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record. Ortiz, 955 F.2d at 769. It is the role of the ALJ, not the role of this court, to resolve conflicts in the evidence. Id.

### III.  ANALYSIS

#### A.  Weight Given to Dr. Solomon's Opinion at Step Two

Diomede-Reynolds argues that the ALJ gave insufficient weight to Dr. Solomon's opinion that Diomede-Reynolds' impairments met or equaled listings 9.06, 6.02C5, and 2.02. In his decision, the ALJ stated that because the alleged tumor "has not been definitively shown to actually exist by any medically acceptable diagnostic test," the ALJ "cannot give Dr. Solomon's medical opinion regarding the listing level severity of the claimant's elevated dopamine levels any significant weight."

(Tr. at 26.)

Diomede-Reynolds argues that, by rejecting Dr. Solomon's conclusion that a tumor existed, the ALJ was substituting his own lay opinion for Dr. Solomon's uncontroverted medical judgment.[3] To reach his tumor diagnosis, Dr. Solomon relied upon the elevated urine dopamine levels identified when Diomede-Reynolds when she was hospitalized in 2000, along with Diomede-Reynolds' other medical records and testimony by her husband. Tr. at 530-33. Although Dr. Solomon is the only medical expert in this case to opine that a tumor exists, none of the other experts expressed opinions that were inconsistent with Dr. Solomon's diagnosis. Thus, Dr. Solomon's tumor diagnosis is uncontroverted by other medical evidence in the record. Even if, as the Commissioner argues, there is a high likelihood that Dr. Solomon's diagnosis is incorrect, the ALJ inappropriately substituted his own lay

---

[3] Alternatively, Diomede-Reynolds characterizes the question of whether a tumor exists or not as a red herring; the ultimate issue, she argues, is whether her adrenal gland dysfunction caused a sufficiently limiting impairment, not whether she has a tumor or not. That reasoning is, however, wrong. Dr. Solomon concluded that the adrenal gland dysfunction equaled the relevant listings *because of* the alleged tumor. Thus, Dr. Solomon's conclusion that the dysfunction equaled the relevant listings cannot stand if the ALJ acted correctly in discounting Dr. Solomon's underlying conclusion that a tumor exists.

(Tr. at 26.)

Diomede-Reynolds argues that, by rejecting Dr. Solomon's conclusion that a tumor existed, the ALJ was substituting his own lay opinion for Dr. Solomon's uncontroverted medical judgment.[3] To reach his tumor diagnosis, Dr. Solomon relied upon the elevated urine dopamine levels identified when Diomede-Reynolds when she was hospitalized in 2000, along with Diomede-Reynolds' other medical records and testimony by her husband. Tr. at 530-33. Although Dr. Solomon is the only medical expert in this case to opine that a tumor exists, none of the other experts expressed opinions that were inconsistent with Dr. Solomon's diagnosis. Thus, Dr. Solomon's tumor diagnosis is uncontroverted by other medical evidence in the record. Even if, as the Commissioner argues, there is a high likelihood that Dr. Solomon's diagnosis is incorrect, the ALJ inappropriately substituted his own lay

---

[3] Alternatively, Diomede-Reynolds characterizes the question of whether a tumor exists or not as a red herring; the ultimate issue, she argues, is whether her adrenal gland dysfunction caused a sufficiently limiting impairment, not whether she has a tumor or not. That reasoning is, however, wrong. Dr. Solomon concluded that the adrenal gland dysfunction equaled the relevant listings *because of* the alleged tumor. Thus, Dr. Solomon's conclusion that the dysfunction equaled the relevant listings cannot stand if the ALJ acted correctly in discounting Dr. Solomon's underlying conclusion that a tumor exists.

judgment for Dr. Solomon's when he rejected Dr. Solomon's diagnosis. Ramos v. Barnhart, 60 Fed. Appx. 334, 335 (1st Cir. 2003) ("Significantly, no physician . . . rejected such a diagnosis. Thus, by concluding that claimant did not have a somatoform disorder, the ALJ was substituting his own lay opinion for the uncontroverted medical evidence."); Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) ("[A]n ALJ is not free to substitute his own judgment for uncontroverted medical opinion"). The ALJ's actions here overstepped the boundaries of what the ALJ may decide, which justifies a remand for further adjudication.[4]

---

[4] Diomede-Reynolds argues that this court should order an award of benefits rather than remanding the case for further adjudication. It is by no means clear, however, that Diomede-Reynolds is indeed entitled to DIB. Although there are some indications in the record that excessive urine dopamine levels are suggestive of the presence of the tumor, Dr. Solomon's application of that technique may well be incorrect or misleading. Without more expert testimony on the issue, neither I nor the ALJ can know whether this is the case. Accordingly, simply directing the Commissioner to award benefits would be inappropriate. See Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) ("[O]rdinarily the court can order the agency to provide the relief it denied only in the unusual case in which the underlying facts and law are such that the agency has no discretion to act in any manner other than to award or to deny benefits").

## B.   Weight Given to and Discussion of Dr. Clark's Opinion at Step Four

Diomede-Reynolds argues that the ALJ either gave insufficient weight to or mischaracterized Dr. Clark's opinion regarding how the combination of hypertension and anxiety affected her RFC. In his decision, the ALJ relied upon Dr. Clark's conclusions regarding physical impairment but determined that the weight of the medical evidence was not consistent with Dr. Clark's conclusions regarding the effect of anxiety on Diomede-Reynolds' RFC.

Substantial evidence existed to support the ALJ's conclusion that Diomede-Reynolds' anxiety did not reduce her RFC to the point that she would be unable to return to her PRW. First, although Dr. Clark did prescribe anti-anxiety medication, he did not refer her for psychological evaluation or treatment for her anxiety. Meanwhile, as the ALJ noted, the other medical experts testified that Diomede-Reynolds did not suffer from any vocationally significant mental limitations. Tr. at 28-29. Dr. Koocher indicated that he found no evidence of significant mental limitations. Tr. at 507-09. Dr. Fitzgerald opined that Diomede-

Reynolds should have no problems with concentration or task completion unless she became tired or distressed.  Tr. at 252-53.  Dr. Claiborn found that there was no evidence that she met the criteria for an anxiety-related mental impairment.  Tr. at 556-58.  Accordingly, Dr. Clark's anxiety conclusions were not entitled to controlling weight, and it was within the ALJ's discretion to discount those conclusions.  There is no basis for reversal on this ground.

### C.   Conclusions Regarding Diomede-Reynolds' Mental Impairment

Diomede-Reynolds argues that the ALJ failed to make a specific finding regarding the effect that her panic and anxiety disorders had on her RFC.  To the contrary, however, the ALJ explicitly found that the medical evidence did not support Diomede-Reynolds' allegations that her psychological ailments caused vocationally significant limitations.  Tr. at 28-29.  This conclusion was supported by substantial evidence from Drs. Koocher, Fitzgerald, and Claiborn.  Tr. at 28.  Accordingly, this argument has no merit.

### IV.  **CONCLUSION**

The ALJ improperly substituted his medical judgment for Dr. Solomon's uncontradicted medical opinion that Diomede-Reynolds suffers from a disabling adrenal tumor.  Additional evidence on this issue is required.  Accordingly, I grant in part plaintiff's motion to reverse ([Doc. No. 6](#)), deny defendant's motion to affirm ([Doc. No. 7](#)), and pursuant to sentence four of [42 U.S.C. § 405(g)](#), remand this case to the Social Security Administration. The clerk is directed to enter judgment in accordance with this order and close the case.

SO ORDERED.

/s/Paul Barbadoro         
Paul Barbadoro
United States District Judge

April 1, 2008

cc:  Peter Marsh, Esq.
     Robert Rabuck, Esq.